## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DELAWARE HEALTH CORPORATION, a Delaware corporation<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL O. LEAVITT, Secretary of Health and Human Services,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case Number: 07-829<br>)<br>)<br>)<br>)<br>)<br>) |

### ANSWERING BRIEF IN RESPONSE TO PLAINTIFF'S
### CROSS-MOTION FOR SUMMARY JUDGMENT

**COLM F. CONNOLLY**
**United States Attorney**

By: **Lesley F. Wolf**
**Assistant United States Attorney**
1007 N. Orange Street, Suite 700
Wilmington, Delaware 19801
(302) 573-6277

**Brett J. Bierer**
**Attorney**
**U.S. Department of Health and Human Services**
**Office of the General Counsel**
**CMS Division**
**Room C2-05-23**
**7500 Security Boulevard**
**Baltimore, Maryland 21244–1850**
**(410) 786-1473**

**Dated:** **July 18, 2008**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   The Intermediary's Notice to Reopen the Determination Was Proper. . . . . . . . . . . . . . . 1

    A.   Because the Original Notice of Program Reimbursement Resulted From
        Fraudulent Conduct, There Was No Time Limit on Reopening . . . . . . . . . . . . . . 1

    B.   Even If The Three-Year Time Limit Applies, The Intermediary Complied with the
        Time Limit on Reopening . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  The Intermediary's Use of the Statistical Extrapolation to Adjust the Cost Reports for
    Fraudulent Billings by Provider's Sub-Contractor Was Proper  . . . . . . . . . . . . . . . . . . . . 5

III. Even If the Intermediary Could Not Use the Statistical Extrapolation, Delaware Health
    Did Not Meet Its Burden of Documenting Costs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## TABLE OF AUTHORITIES

**CASES**                                                                                                    **PAGE**

Girling Health Care, Inc. v. Shalala,
      85 F.3d 211, 216 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Illinois Physicians Union v. Miller,
      675 F.2d 151 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

Mile High Therapy Centers, Inc. v. Bowen,
      735 F.Supp. 984 (D. Colo. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Mt. Sinai Hosp. V. Weinberger,
      517 F.2d 329, opinion mod., 522 F.2d 179 (5th Cir. 1975), cert. denied,
      425 U.S. 935 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Prechel, D.O. v. Dep't of Social Services,
      465 N.W.2d 337 (Mich. App. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

Pruchniewski v. Leavitt,
      2006 WL 2331071 (M.D. Fla. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

Richardson v. Perales,
      402 U.S. 389 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Story Parchment Co. v. Paerson Parchment Co.,
      282 U.S. 555 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

U.S. v. Cabrera-Diaz,
      106 F.Supp.2d 234 (D. P.R. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

U.S. v. Carr,
      132 U.S. 644 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

U.S. v. Wurts,
      303 U.S. 414 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Wilson Clinic and Hosp., Inc. v. Blue Cross,
      494 F.2d 50 (4th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**OTHER AUTHORITIES**

42 U.S.C. § 1395g(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

42 U.S.C. § 1395u . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

42 U.S.C. § 1395x . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

42 C.F.R. § 405.371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 C.F.R. § 405.902 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 C.F.R. § 405.1885 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 4, 5, 10

42 C.F.R. § 405.1887 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5

42 C.F.R. § 405.1889 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

Provider Reimbursement Manual (PRM) (CMS Pub. 15-1) § 2932 . . . . . . . . . . . . . . . . . . . . . . 5

HCFA Ruling 86-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S OPPOSITION TO PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

Michael O. Leavitt, Secretary of Health and Human Services ("the Secretary") responds to Plaintiff, Delaware Health Corporation's ("Plaintiff" or "Delaware Health") Motion for Summary Judgment.

**ARGUMENT**

I. **The Intermediary's Notice to Reopen the Determination Was Proper.**

    A. **Because the Original Notice of Program Reimbursement Resulted From Fraudulent Conduct, There Was No Time Limit on Reopening.**

Contrary to the arguments of Plaintiff, the reopening at issue was timely and proper. The Intermediary, in making the adjustments on the Adjustment Report, identified as the basis for the adjustments "[t]o properly offset a portion of costs for Occupational Therapy and Speech Pathology so as to be in accordance with 42 CFR 405.371(a), because of the existence of either **fraud**, **wilful misrepresentation** of such costs or an overpayment in these cost centers." A.R. 135-36 (emphasis added). The auditor from the U.S. Attorney's Office advised the Intermediary to reopen the cost reports because of "altered logs" resulting in inflated therapy costs by Whitehorse (Plaintiff's therapy sub-contractor). A.R. 140. The indictments returned in the District of Delaware, which resulted in the convictions of two principles in Whitehorse, revealed that Whitehorse altered and inflated the therapy logs and submitted invoices for payments of therapy costs resulting in payment in excess of the amount owed to Whitehorse by the nursing homes it serviced. A.R. 158.

The Provider Reimbursement Manual, and Medicare regulations, provide no time limit

for reopening a cost report if the determination "was procured by fraud or similar fault of any party to the determination or decision." 42 C.F.R. § 405.1885(d). Although "similar fault" is not defined in this sub-part of the regulations, it is defined in another sub-part, at 42 C.F.R. § 405.902, and states that "to obtain, retain, convert, seek, or receive Medicare funds to which a person knows or should reasonably be expected to know that he or she or another for whose benefit Medicare funds are obtained, retained, converted, sought, or received is not legally entitled." "Fraud or Similar Fault" is also defined in the Medicare Intermediary Manual as "Deception by a person who knows that the deception may result in unauthorized benefits to someone." A.R. 205. In fact, a review of the regulatory scheme reveals that such a construction is inconsistent with proper understanding of the regulations. Notwithstanding that Whitehorse was not a "party" to the original determination, Delaware Health contributed to the Medicare overpayment by seeking reimbursement for the fraudulent costs submitted by Whitehorse. Thus, because Delaware Health, a party to the determination, submitted fraudulent documents to obtain Medicare reimbursement, there was no time-limit for reopening the cost reports. See 42 C.F.R. § 405.1885(d). Delaware Health's knowledge of the fraud is irrelevant. The circumstances of this case constitute "fraud or similar fault" within the meaning of § 405.1885(d). Therefore, the Intermediary's reopening was timely.

      **B.**    **Even If The Three-Year Time Limit Applies, The Intermediary Complied with the Time Limit on Reopening.**

Even if the Defendant were subject to the three year time limit (a point he vigorously disputes), he has complied with that provision regarding the reopening and issuing notices of the reopening and revisions.

The Parties agree that the Notices of Program Reimbursement ("NPRs"), the agency

determinations at issue in this case, were issued on September 28, 1999.  Plaintiff's Motion for Summary Judgment ("Pl's Mot.") at 4; see A.R. 115.  The Parties further agree that the Intermediary issued another notice regarding the NPRs on August 21, 2002, within three (3) years of the original NPRs, the original agency determinations.  Pl's Mot. at 4; see A.R. 118.  Additionally, the Parties agree that the Intermediary issued two additional notices regarding the NPRs on March 18, 2003 and October 23, 2003.  Pl's Mot. at 4; see A.R. 120-128.  The Parties, however, disagree on the character and significance of the notices of August 21, 2002, March 18, 2003 and October 23, 2003.  Only by mischaracterizing the Intermediary's October 23, 2003 revised final settlement (A.R. 126) as the reopening, can Plaintiff argue Defendant's actions were untimely.  See Pl's Mot. at 4.  However, as set forth below a reopening, notice of reopening and a notice of a revised determination are separate events, and the Intermediary complied with the various requirements including notice of the reopening on August 21, 2002 (pursuant to the requirements of 42 C.F.R. §§ 405.1885(a) and 405.1887(a)), notice on March 18, 2003 to Delaware Health to present additional information because the reopening resulted in revised NPR (pursuant to 42 C.F.R. § 405.1887(b)), and notice of the revision on October 23, 2003 (pursuant to 42 C.F.R. §§ 405.1885(a) and 405.1889) .

   Plaintiff argues that an Intermediary's investigation must be conducted and completed and all notices regarding the reopening and revision must occur within three years of the original agency determination.  See Pl's Mot. at 10.  That is simply not the requirement.  The Intermediary must reopen the case within three years, but there is no corresponding obligation to issue a new determination within three years.  See 42 C.F.R. § 405.1885(a) ("No such determination or decision may be <u>reopened</u> after such 3-year period except as provided in

paragraphs (d) and (e) of this section." (emphasis added)).  In fact, where the provider requests reopening, the regulation does not even require that the *notice* of reopening occur within three years, merely that the request to reopen occur within three years.  See 42 C.F.R. § 405.1885(a). Where, as here, the Intermediary reopens on its own motion, 42 C.F.R. § 405.1885(a) sets a three year time limit for the Intermediary to issue the notice of reopening, and sets no explicit time limit for issuance of the revised determination.

      The Administrator found that the Intermediary's notice of August 21, 2002, captioned "Reopening of the 1996 and 1997 cost reports for Medicare purposes," was timely in that it occurred within the 3-year period to reopen the NPR and constituted notice of the reopening. These findings were based upon substantial evidence and were not arbitrary or capricious.  The August 21, 2002 notice advised that the Intermediary expected to issue a revised NPR upon the conclusion of its investigation.  A.R. 118.  And that is exactly what happened.  The March 18, 2003, Notice advised Plaintiff that the Intermediary would make adjustments to recover improper therapy costs, provided the basis for the recovery, included several sheets of calculations of the adjustments, and invited Plaintiff to respond before the Intermediary issued a revised settlement, as contemplated by 42 C.F.R. § 405.1887(b).  A.R. 120-24.  Later, in the October 23, 2003, Notice the Intermediary issued the revised determination (the revised NPR), which constituted a new decision as to the matters reopened and provided new appeal rights as to those matters pursuant to 42 C.F.R. § 405.1889.  A.R. 126-28.

      Delaware Health's argument relies on the erroneous assumption that the notice of the reopening and the notice of revisions (i.e. the revised final settlement) occur in the same notice. The actual regulations, however, make no such requirement.  See 42 C.F.R. §§ 405.1885(a) and

405.1887(a) ("When such a reopening results in any revision in the prior decision notice of said revision or revisions will be mailed to the parties with a complete explanation of the basis for the revision or revisions."); PRM § 2932 ("When a correction is made in a determination or decision following the reopening, a notice of correction will be similarly mailed and addressed." and "If, after a notice of reopening had been issued, it is determined that no correction is warranted, the provider or other party will be notified accordingly.") (A.R. 202).   Thus, the series of letters that the Intermediary sent to Delaware Health fully conformed with the various notice requirements set forth in the regulations and Manual for reopening, giving notice of reopening, and notice of revision to the determination.  Accordingly, the Secretary's decision adopting the PRRB's finding that the Intermediary's reopening was proper should be upheld.

## II.     The Intermediary's Use of the Statistical Extrapolation to Adjust the Cost Reports for Fraudulent Billings by Provider's Sub-Contractor Was Proper.

Plaintiff complains that the Intermediary used for extrapolation purposes, the records of another SNF to whom Plaintiff's sub-contractor also submitted fraudulent Medicare claims for therapy services, rather than reviewing Plaintiff's records directly.  However, Plaintiff readily concedes that its own records would not have revealed the fraudulent conduct, because it only had records of bills from the sub-contractor, and not the incremental periods of time that the therapist actually provided the service (i.e. the nursing notes did not specify periods of time).  A.R. 79-81, 87.  Plaintiff, is satisfied by relying upon the records of its subcontractor, who has been convicted of fraudulently inflating its logs and invoices to increase its own reimbursement.  Moreover, even the records which Plaintiff retains fail to document the incremental amount of time each therapist purportedly spent with individual Medicare beneficiaries.  A.R. 79.  On this basis alone, the Administrator could have disallowed Plaintiff's entire cost of furnishing therapy

services.  See Girling Health Care, Inc. v. Shalala, 85 F.3d 211, 216 (5th Cir. 1996).

The Administrator recognized this anomaly, whereby the providers' own records would not have uncovered the wrong doing because the fraudulent conduct was committed by providers' sub-contractor, by finding: "Fraud, by its very definition, involves a knowing misrepresentation or concealment of a fact.  Thus, given the covert nature and level of evidence necessary to meet the definition of fraud, methods used to establish fraud might be considerably different than those used to detect other payment areas and are not necessarily addressed by typical auditing procedures."  A.R. 6.  The Administrator noted that the statistical extrapolation in this case was developed by the U.S. Attorney's Office and used in the criminal prosecution.  This same extrapolation withstands scrutiny at an administrative proceeding, where the standard for proof is merely more than a scintilla.  Here, two principals in Whitehorse pled guilty and were convicted in the U.S. District Court for the District of Delaware, of altering and inflating logs, and receiving inflated reimbursement as a result of their fraudulent conduct.  There was no need, in the subsequent civil administrative hearing, to re-litigate the fraudulent and criminal conduct of the therapy provider.  The Administrator could reasonably rely upon the findings in that criminal proceeding, at the administrative proceeding.  Though unhappy with the result, Delaware Health's criticism of the statistical analysis and its use in court and administrative proceedings is baseless.

There is a presumption that the Secretary's statistical analysis is valid.  See HCFA Ruling 86-1 (attached to Defendant's Opening Brief as Exhibit 1).  Delaware Health has argued that the statistical extrapolation should be disregarded because it is based upon the ratio of Whitehorse's fraudulent billings to another SNF for one month out of two years worth of billings.  Yet

Delaware Health has not identified any inaccuracy resulting from that process, or explained how the use of that statistic is arbitrary and capricious. On the contrary, there is a rational basis between the audited sample and the extrapolated statistic. See Illinois Physicians Union v. Miller, 675 F.2d 151.

Plaintiff feigns ignorance of the circumstances that make the situation sub judice unusual. Pl's Mot. at 16. In typical Intermediary reviews of cost reports, the Intermediary simply requests documentation from the provider to determine whether the cost is allowable and supported by the documentation. Here, however, Delaware Health did not maintain the fraudulent documentation— its sub-contractor, whose records the Intermediary did not have access to, had the records (which may have been destroyed). In the absence of extrapolation, there would be no way for the Intermediary to estimate the inflated costs passed on to Medicare based upon Delaware Health's records. Nor, incidentally, would Delaware Health's records support the incremental time billed to Medicare. Therefore, the only method available for the Intermediary to estimate the fraudulent costs was to extrapolate based upon the statistical model developed by DOJ to examine the rate of fraudulent costs at another SNF that Whitehorse serviced. Delaware Health remained free to challenge the model by presenting evidence that its SNF differed from the "fraud" SNF or show that the fraud was committed at a different proportion than at the other SNF. Delaware Health chose not to do this, nor did it suggest another method to account for the fraudulent costs to Medicare.

Delaware Health has also criticized the Secretary for not following "proper standards" in developing its statistical analysis. See Pl's Mot. at 12. This argument is a strawman. The statistical community has not promulgated any standards or generally accepted principles, and

thus there is no standard to which the Secretary must adhere.  See Pruchniewski v. Leavitt, 2006 WL 2331071, 10 (M.D. Fla. 2006).  The "standards" Plaintiff attempts to impose upon the Secretary are inapplicable and represent general auditing standards from the Medicare Intermediary Manual and the Government Accounting Standards, rather than any specific statistical standards.[1]  Pl's Mot. at 12-13, 15.  The Secretary is free to develop reasonable methods of estimating improper costs in a given case, and Plaintiff has cited no authority requiring the Secretary to engage in a full-blown audit of every therapy cost to determine which ones were improper.

Caselaw supports the Secretary's action here.  In the context of a Medicare False Claim Act calculation of an overpayment, the court stated: "There is no set formula for measuring damages under the False Claims Act.  Damages have been measured in a variety of ways and the measure applied by the courts in specific cases has been greatly influenced by the nature of the fraud and the type of Government transaction affected by it."  U.S. v. Cabrera-Diaz, 106 F.Supp.2d 234, 239 (D.P.R. 2000).  The government has an inherent right to recover wrongful payments.  U.S. v. Carr, 132 U.S. 644, 650 (1890).  The government's right to recoup an improper payment derives from the common law, and is not dependent upon any statute.  See U.S. v. Wurts, 303 U.S. 414 (1938).  The government's common law right to recover improper payments extends to the Medicare program.  Mt. Sinai Hosp. v. Weinberger, 517 F.2d 329 (5th Cir. 1975); Wilson Clinic and Hosp., Inc., v. Blue Cross, 494 F.2d 50 (4th Cir. 1974).  By statute,

---

[1] Plaintiff's expert testified that the "standards for sampling" were derived from the PRM and "General Accounting Standards," fields in which she had no expertise.  A.R. 95.  Moreover, there was no testimony that these purported "standards" are general standards in statistical analysis.  Although Dr. Schumi agreed with a leading question that there are "professional standards," (A.R. 96) she did not testify what those standards are or where they are found.

the Secretary may use any reasonable means to recover an overpayment.  See 42 U.S.C. § 1395g(a) (authorizing "necessary adjustments on account of previously made overpayments."); 42 U.S.C. § 1395u(a); 42 U.S.C. § 1395x(v)(1)(A)(ii); Mile High Therapy Centers, Inc. v. Bowen, 735 F.Supp. 984, 986 (D. Colo. 1988).  It is permissible to place the burden on the provider to prove that the claimed costs are proper and that the Secretary's calculation is inaccurate.  See Illinois Physicians Union, 675 F.2d 151; Prechel, D.O. v. Dep't. of Social Servs., 465 N.W.2d 337, 338 (Mich.App. 1990).

In a Medicaid case involving sampling and extrapolation, the court looked to a Supreme Court precedent involving the calculation of damages:

> The Supreme Court concluded that once it has been established that the petitioner had sustained some damage, it would be 'a perversion of fundamental principles of justice to deny all relief to the injured person' merely because the damages were not susceptible of exact calculation.  The Court held that, although it was improper to determine damages by mere speculation, it would be sufficient 'if the evidence show(ed) the extent of the damages as a matter of just and reasonable inference, although the result may only be proximate.'

Illinois Physicians Union, 675 F.2d at 156 (internal citations omitted), quoting Story Parchment Co. v. Paerson Parchment Paper Co., 282 U.S. 555, 563 (1931).  In a recent case where a healthcare provider complained that the Secretary's agent did not maintain sufficient documentation to establish the validity of a statistical extrapolation, the Court, in addition to finding that there was no established standard for statisticians[2] and that the HCFA guidelines

---

[2]While the Pruchniewski court accepted that the statistical community promulgated no standards, the value of Delaware Health's "expert" was of even more limited value than the provider's expert in Pruchniewski.  Delaware Health's "expert" may have had academic background in statistics, but she was not an expert in fraud detection, healthcare regulation or government auditing procedures.  Her views were of limited value in the context of this case.

were not binding upon the agent, upheld the use of a statistical extrapolation where the agency explained why the method was used and the provider was unable to show that use of the statistical extrapolation was unreliable.  See Pruchniewski v. Leavitt, 2006 WL 2331071.  Likewise, here, when the provider submitted its sub-contractor's inflated bills for payment, the Administrator explained that the use of the Department of Justice's statistical extrapolation was appropriate— there was a need to depart from the typical statistical methods to estimate the extent of the overpayment.  Because the Administrator explained the rationale for its use, and Delaware Health failed to show that the extrapolation was unreliable, there was a substantial basis for using the statistical extrapolation, and the use was not arbitrary and capricious.

   Delaware Health parrots the improper evidentiary standard adopted by the PRRB in its decision criticizing the Intermediary for relying upon documentary evidence, but producing "no evidence of this (fraudulent practice) in the record in the form of witness testimony, affidavits or other documents."  Pl's Mot. at 6, quoting PRRB Decision at 10-11.  However, formal rules of evidence do not apply in PRRB proceedings.  See 42 C.F.R. § 405.1855.  In an administrative proceeding, a decision can stand on documentary evidence and does not require the testimony of live witnesses.  See Richardson v. Perales, 402 U.S. 389 (1971).  Additionally, in a case such as this one, where there was a criminal proceeding resulting in a conviction of the fraudulent therapy provider regarding inflating hours and submitting fraudulent invoices, there was no reason to re-create an entire evidentiary record; the Secretary could reasonably rely on the facts upon which the convictions were based, which were also submitted as documentary exhibits at the administrative proceeding.  These documents, with their indicia of reliability, constitute substantial evidence upon which the Secretary could and did base his decision.

Plaintiff implies that the Secretary's entire decision rests upon one statement by an anonymous witness. That is false. The Secretary relied upon several facts in the record in the evidentiary hearing, which combined together constitute substantial evidence, to support his decision— the investigation by the DOJ auditor, the indictments, and subsequent convictions of the principals in Whitehorse for fraud, as well as consideration of the testimony of Plaintiff's witnesses. Moreover, Plaintiff criticizes the Intermediary for not reviewing Plaintiff's own records. However, Plaintiff ignores the fact that, before issuing the revised settlements, the Intermediary identified the basis for revising the settlements and sought documentation from Plaintiff to respond to the proposed revisions. A.R. 120-21. Plaintiff offered nothing. At the hearing, Plaintiff's own witness testified that the Intermediary's review of Delaware Health's records would have been futile because Delaware Health based its Medicare billings for therapy services upon the invoices from Whitehorse. Delaware Health did not maintain independent documentation of the therapy hours allegedly worked on each patient. In essence, Delaware Health argues the Intermediary was required to waste its time reviewing Delaware Health's records which by it's own admission would not assist in determining the fraudulent billing. Delaware Health only maintained the inflated invoices that Whitehorse billed; the fraudulent records upon which the inflated invoices were based were prepared by Whitehorse, not Delaware Health. The DOJ investigators had access to Whitehorse's records. Thus, it was entirely appropriate for the Secretary to rely upon the records obtained from Whitehorse through that investigation, and to base the extrapolation upon the findings of the criminal investigation. The Secretary's use of the statistical analysis derived from the DOJ investigation of fraudulent billing at the Harrison House of Georgetown SNF by Whitehorse could properly be extrapolated to

estimate the fraudulent billing at Delaware Health's SNF.

### III.   Even If the Intermediary Could Not Use the Statistical Extrapolation, Delaware Health Did Not Meet Its Burden of Documenting Costs.

It is legally permissible to place the burden on the provider to prove the allowability of an asserted cost. See Prechel, 465 N.W.2d 337. There is no question that Delaware Health paid its sub-contracting therapist's bills. The Secretary readily concedes that Delaware Health paid the bills. The issue is which party bears the cost when a sub-contractor inflates its costs to Medicare beneficiaries. Because the provider chooses its own sub-contractor, is in the best position to monitor the billings and conduct of its subcontractor, is required to document services (including time) billed, and is ultimately responsible for the costs it submits to Medicare, the provider should bear the cost. There is no authority for the proposition that Medicare should pay for services never provided to Medicare beneficiaries, simply because the provider unwittingly paid for the inflated costs. Moreover, Delaware Health concedes that it does not have nursing notes that document the length of time it billed Medicare for therapy services. It merely relied upon invoices and logs from Whitehorse.

Delaware Health had the opportunity to provide any documentation needed to justify the costs that the Intermediary proposed to remove. While the Intermediary did not ask for proof that the records had not been falsified, Delaware Health could have produced documents to justify the hours fraudulently billed. Instead Delaware Health did nothing. Thus, Delaware Health cannot now complain that the Intermediary removed costs related to undocumented hours.

## CONCLUSION

For the reasons set forth above and in the Secretary's opening memorandum, the Secretary respectfully requests that his motion for summary judgment be granted.

DATED: July 18, 2008

                                        Respectfully submitted,

                                        COLM F. CONNOLLY
                                        United States Attorney

                            BY:/s/Lesley F. Wolf
                                        Lesley F. Wolf
                                        Assistant United States Attorney
                                        1007 Orange Street, Suite 700
                                        Wilmington, Delaware 19899-2046
                                        (302) 573-6277
                                        lesley.wolf@usdoj.gov

                                        /s/Brett J. Bierer
                                        Brett J. Bierer
                                        U.S. Department of Health and Human Services
                                        Office of the General Counsel
                                        Centers for Medicare & Medicaid Services Division
                                        Room C2-05-23
                                        7500 Security Boulevard
                                        Baltimore, Maryland 21244-1850
                                        (410) 786-1473
                                        brett.bierer@hhs.gov

OF COUNSEL:

THOMAS R. BARKER
Acting General Counsel

JANICE L. HOFFMAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General
    Counsel for Litigation

United States Department of
    Health and Human Services